Sheila Haddock for Clouse et al. May it please the court, my name is Sheila Haddock. The appellants in this case are eight former student athletes and members of Southern Methodist University's all-female rowing team. They brought two claims against SMU in the Northern District of Texas, a federal claim alleging intentional discrimination under Title IX and a state law claim for negligence arising out of physical injuries they suffered as a result of SMU's wrongful conduct. The district court erred when it found, as a matter of law, that both the federal and state law claims were barred by Texas's two-year statute of limitations. And the error occurred when the district court focused solely on the time when the rowers realized that they were suffering physical symptoms of the injury and ignored facts in the record that established that they did not know of the connection between SMU's conduct and those physical injuries and ignored the discrimination claim under Title IX altogether. Under federal law, the limitations period begins at the moment the plaintiff becomes aware that they have suffered an injury. But courts tell us that awareness encompasses two elements, the existence of an injury and causation, and that is the connection between the injury and the defendant's conduct. Okay, but what I'm wondering is, I know that life is online now, didn't these young ladies know that other people were getting injured? They knew, isolated to SMU, that some of their classmates and teammates were being injured. But what they didn't know, that that injury was isolated almost exclusively to SMU. They were being told by the coaching staff and the training staff and even the medical sports medicine staff that these injuries were attributable to a number of things. Either they were novices and they were new to rowing and the pain would go away once their bodies got used to it. They were not training hard enough, that they were lazy or that their injuries, their pain was related to something that they were doing, that their mattresses were too soft, they were wearing high heels, that their bodies were just shaped differently. So they were giving a number of excuses and what we now know after discovery was that by the time these rowers were injured, 20 women who had been diagnosed with hip labral tears, and between 2010 and 2018, which was the discovery period in this case, more than 40 women at SMU suffered hip labral tears or hip injuries, 20 had had surgery. So what we know in looking at the facts that the... Did they not know it at the time? I mean, like I said, all this kind of stuff ends up online. People say, oh no, I'm feeling bad, oh no, I'm getting surgery, oh no. That sort of thing is online. Was that not known to them? What they knew was what their teammates were experiencing and that seemed consistent with what the coaches were telling them. What they didn't know is that behind the scenes, SMU had already recognized as early as 2010 that they had a problem. So in 2010, we first have an email between SMU administrators that a parent of a rower on the 2009-10 team was complaining about his daughter having to have her surgery on both hips because of the labral tears. Yeah, I mean, I'm well aware that they were aware of issues. What I'm wondering is, I understand that SMU didn't do what could help, but what did they do that caused the hurt as opposed to just not helping the hurt? Well, and that's something that didn't... It's coming through with the timeline. They were trying to investigate in a limited way of what was happening, but they never changed anything. The most important piece that they ignored and what's particularly compelling with the timeline of this case was in 2013, they commissioned an audit by a physical therapist because they had had by that point a dozen or so hip injuries and they wanted to know if there was anything that was causing it. So they invite a physical therapist. She does an audit and produces what we refer to as the Eaton Report. She makes suggestions. She makes specific comments that what she observed during practices is that... And warns them of the danger of using an anterior tilt and encouraging back extension, which leads to an anterior tilt, which leads to the hip injuries. We had an expert who is world-renowned, and I'm not exaggerating when I say that, his credentials are unparalleled, and has coached rowing all over the world, that it is extremely rare in rowing to have that type of hip labral tear. And what happened was it was a perfect storm of incompetent coaching, inadequate training or overtraining, with weightlifting in particular, which requires deep flexion of the hip, and when you couple that with an overtraining and not allowing rest time, you have this perfect storm of events where the coach is an inexperienced coach. He was there, hired as an assistant coach when the program began in 1999 and 2000, became the head coach, never received any other formal training or certifications. He builds this program. His assistant coaches are novice rowers who he trained, so the only training that they have is what he taught them. And so by 2010, he's starting to receive employment evaluations that are critical of the number of injuries that are occurring in his program, but at the same time, he's being told, you need to increase participation because, as reflected in the record, the rowing program was initiated to comply with Title IX, to increase the participation number. So he's got these competing demands on him. Reduce the number of injuries, increase the roster, and win some races. They were not winning, they were performing very poorly. So under all of this pressure, he's putting more pressure on the athletes, but what the athletes don't know is they don't know anything about this audit. Five of the rowers were . . . Right, but you know, they knew that they were injured during the rowing, and Judge Godbee seemed to think that was enough for them to want to reach out and find out more, and therefore the time began of the two years. I think . . . What is your response to Judge Godbee's view on that? The response is that we have to look at the context, and the comparison is the duty to inquire would be considered the circumstances and the context in which the injury occurred. So if we look at the context, these are 19-year-old student athletes who either were . . . some had previous rowing experience, some did not. Most of them were on scholarship. They were at a D1 school. They believed that their coaches were experienced and knowledgeable. They listened to what their coaches were telling them. Even if they looked around and said, wow, four of us are injured right now, and we all have hip injuries, what were they to do? Who were they to ask? Where was the inquiry to be made? They have the coaches and the trainers and the medical staff, the sports medicine provider through the Carroll Clinic in Dallas, were all telling them it's normal. It's a part of rowing. If you want to keep rowing, you're going to further damage your hip, and they ended up medically disqualified. So the inquiry, even if they had made inquiry, which they did, they were asking, why was this happening? And they were told either it's inherent in the sport, which it was not, the injury . . . I don't want to interrupt if you're answering Judge Payne's question, but tell me about the Title IX claim. Do you agree that the accrual of the Title IX claim is the same time as the tort claim? No, not necessarily. In what sense? Under Title IX, because it is the federal claim, it has a little bit different analysis, especially under the continuing violation doctrine, because six of the eight of these women were timely in the violation cause of action, because one graduated in 2016, and the other four, or the other five, graduated in 2017. So they were suffering violations of Title IX throughout their period of eligibility, and that's what's key here, is SMU would have you stop the inquiry at the moment they were injured and stopped participating in rowing, is the way they've put it. Now, we don't know whether they mean when they were no longer able to participate, but before they were medically disqualified, or if they mean when they were medically disqualified, but our position is they were eligible. Had they not been injured, they would have been eligible to continue throughout their graduation, and part of the damages available under Title IX are damages related to the deprivation of the opportunities for, opportunities and benefits, and one of those- Claim that the medical care or the training was not the same as offered to other athletes, particularly male athletes, is that the nature of the claim? Yes, there's three treatment areas. Title IX, the Title IX claim is a little complex, and has been the subject of a lot of briefing throughout this litigation, and there's a bit of a fundamental misunderstanding, I think, that has been perpetuated through the litigation. The Title IX, the intentional discrimination, the regulations for Title IX give a laundry list of a number of different areas of treatment, it's called treatment areas, and Judge Godbee limited us to three. We initially made the claim on all of them, and we had a Title IX expert who was prepared to opine given the adequate information, but we were limited in discovery to three treatment areas, and that was the provision of coaching and training, provision of medical care and services, and the provision of equipment, and so given that, the analysis is that as female student athletes, and particularly the rowing team, which based on all the data that's been provided, was at the very bottom of even women's sports. Our expert did a comparison of male versus female sports, and rowing was even at the bottom for female sports. So the coach really, the coach's actions touch on every part of this, the negligence claim and the Title IX claim. They initiated a rowing team in 1999, hired him with no experience, basically, except an intramural coaching experience, and he was a wine sommelier at the time. He had never coached a D1 school in any capacity. Within a year, he was the head coach. Within 10 years, when Monique Holland, who was the Title IX athletics coordinator and a senior women's administrator, was hired in 2009, she started looking into things, and that's when we see this progression beginning in 2010 and continuing all the way to 2018, where Judge Godby cut the discovery period off, because that was a year after the last – our plaintiff, Ms. McGowan, whose claim went on, was not barred by the statute of  limitations. She graduated in 2018, so we were able to get discovery for a year after they fired the coaching staff, including Coach Wright, and during that period of time, we see every year after year after year, there's more that builds on what SMU knew and what SMU failed to do, and as it turns out, they were talking about the high rate of injuries with everyone internally. They were doing their informal surveys with other schools, but they weren't telling the rowers that there was something terribly, terribly wrong at SMU. They just let it continue until finally the student surveys were so bad in 2016, it all came to a head finally, that they could not ignore it anymore, and by this point, we have almost 40 women injured that they took employment action and fired them in May of 2017. So –  Your time is up. You've saved time for rebuttal. Thank you. All right, we will now hear from Scott Hastings on behalf of SMU. May it please the Court. Judge Godbee was correct in this case, and his summary judgment decision should be affirmed. Your Honors, after we filed our brief in this case, an additional opinion came out that I would like to make the Court aware of. The plaintiff is called Hillberg, is also in the Northern District of Texas. It was another rower who sued SMU. Magistrate Judge Rutherford reached the exact same conclusion as Judge Godbee, but she did it on a motion to dismiss standard. Judge Lindsey upheld that decision. So we now have three judges in the Northern District who have all reached the same correct conclusion regarding . . . Okay, but how can SMU support the notion that they knew all these problems, but weren't doing anything to help these ladies? They were doing things to help the rowers, and that's . . . we're here on summary judgment standard, Your Honor. Right, and summary judgment goes in their favor. If there's a whale, you could have done this, oh, we did that, you know, the back and forth. Yes, Your Honor, so I want to focus on what's in the summary judgment record, which is fatal to the plaintiff's claims. And the summary judgment record shows that SMU did do something. When the rowers were injured, they were provided medical care from the Carroll Clinic. And Your Honor, in Dallas, the Carroll Clinic might be the gold standard when it comes to orthopedic clinics. That's where the Dallas Cowboys go. That's where, when my daughter got injured skiing, that's where we send her. It's a gold standard. The Eaton Report, the plaintiffs call it an audit. I don't want to quibble over language, but the Eaton Report is in the record. It's a two-page report, and if you read the communications around it, when it was presented, it was listed as an outline. It's a two-page report. It should be read because it talks about the Carroll Clinic and physical therapists at the Carroll Clinic and their recommendations. It's not earth-shattering. It talks about things like, if you're having injuries from a repetitive type of activity, which is a sport, you have, you work on strengthening your core. You work on things that are, frankly, the trainers know what to do with injuries. So the record is that when things happened, the Carroll Clinic was involved. SMU did get advice from the clinic, and although the plaintiffs say that SMU was concealing information, think about this for a second. How do you conceal information when SMU sent the very same people, the plaintiffs and the rowers, to the Carroll Clinic who supposedly had the information being concealed? There is no concealment. SMU was trying to do better. That's what the beginning of the Eaton Report says. It was intended to try to provide advice to the coaching staff so that they could do better. So this is not a case, even under a summary judgment record, where SMU was doing nothing. I would like to correct one thing that the appellant stated here, or at least an impression. As far as the training of the individuals involved, one of the assistant coaches at SMU, and this is in the summary judgment record, I believe her name is Amber Harris, she was certified by the United States Rowing, by U.S. Rowing for strength and conditioning. SMU was trying to get the right people in here to not have an issue, and this is also not something that is unique to SMU. If you look at page 5908, I believe it is, in the summary judgment record, SMU's coaches were in contact with coaches from other universities. That page I just mentioned talks about the contacts with UConn, with Duke, with Yale. This is an injury for a sport that was not unique to SMU. And so when SMU had issues, it tried to get medical care. The plaintiffs talk about the audit. Like I said, I don't agree with that wording, but it doesn't matter. They had the trainers looking at and trying to improve things. So this is not a case where SMU did nothing. But let me start off . . . But there was advice made that they didn't follow. That's what your opponent is focusing on. Some of the advice, let me give an example, some of the advice was that you should not flex beyond a certain percentage of flexion because of the potential for injury to hips. The problem is we're talking about rowing. They have to be able to do the full rowing stroke or you're not engaging in the sport. So not every recommendation was followed because some of them would have been contrary in changing the sport. It would be like asking a basketball player that has some kind of knee injury to say, you can run and you can shoot, but don't jump. You can't do that. Some of the recommendations could not have been done, but they did implement others. Your Honor, one of the first problems with the appellant's argument, let's start off with negligence and the discovery rule. They want to argue about the discovery rule, and Texas law is very clear about this. The discovery rule is a categorical analysis. It's not what did the individual plaintiff learn. It's categorical. Certain types of claims could trigger a discovery rule analysis. This type of claim where you have an injury where people are having a physical injury, you can read the record, some of them say they had that moment where they could feel the pop. They knew where the injury comes. Sometimes it's referred to as a traumatic injury. I don't think they're saying they didn't know they were injured from rowing, but they're saying there wasn't reasonable diligence available for them to find out that it was the fault of SMU and not just, oh, well, I had an injury, kind of like if you're just driving down the street and somebody runs into you, you don't think that's because of your college. And Your Honor, that's exactly the point I'm getting to. That is the mistake the appellants are making because Texas has a categorical approach. If it's a traumatic injury, if it's something where you know what's causing it, you may not know exactly why, exactly how. As a matter of law, the discovery rule doesn't apply. This is not a latent injury. They want to talk about the Child's case. The Child's case from the Texas Supreme Court is about silicosis. It's a latent injury that there's exposure to substance that ultimately caused the disease, but you didn't know it. There's no way of knowing that. This is not a latent injury case. So as a matter of law, the discovery rule doesn't apply. You don't even get to the diligence issue. But if you did get to the diligence issue, these are individuals, every one of the plaintiffs knew they were injured rowing, they received medical care for rowing, they had surgery for rowing, and stopped rowing. At that point, from a reasonable diligence standard, they know. They know everything they need to make their investigations, and again, they're talking to the Carroll Clinic. Your opponent said, who could they go ask? What would they do if they're like, okay, why did I get injured in rowing? Where were they supposed to go? What was the reasonable diligence they could do and would have found out the Eaton and so forth information? And Your Honor, the plaintiffs have said it. They knew their other teammates were being injured. They were talking to their doctors. For the plaintiffs to be right, you would have to assume that their doctors, who are not at SMU, they're at the Carroll Clinic, not a party in this case, that their doctors are not providing them the care. I mean, they're asking you to make assumptions about everything when they had access to the doctors, and again, the Carroll Clinic and the physical therapists that work with the Carroll Clinic are the very ones who were studying the SMU program. They're the very people that did the Eaton report. And so, the plaintiffs are asking SMU to assume that SMU does not get the benefit of the regular limitations rule because people at the Carroll Clinic and their physical therapists, their work with SMU, but they're not SMU employees. You'd have to assume that all of those people are not telling the truth. The plaintiff's going to ask them. There is no evidence in this record that they were being denied the ability to ask. There's also the issue, and Coach Wright testified about this in his deposition, he also talked to many other universities. This was not a quiet issue. They had access to everything they need. All that they didn't do was take action sooner. And again, like I said ... Is there not a distinction between an injury resulting from participating in the sport of rowing and more specifically, the methods of training when participating in the sport of rowing? Is there some distinction there? In your honor, if you're getting to the difference between the negligence and Title IX types of issues, there can be a distinction there. We have claims ... What the plaintiffs are trying to do here is pursue a negligence claim and essentially pursue it through Title IX as well. On the Title IX situation, you could have different types of injuries or different types of claims because of being provided inadequate coaching or inadequate facilities. That could be different. But on this record, your honor, I would like to point out that we're here on the summary judgment record and on the issues that the plaintiffs have appealed. Judge Godbee, following the plaintiff's evidence and pleadings, said this case is about three issues only. The appellants brought up the laundry list. Judge Godbee did limit them to the three issues. The appellants have not appealed his analysis of the scope of the Title IX issues. In addition to that, your honors, Judge Godbee, at the motion to dismiss phase, I believe this is at page 282 and 283 of the record, unequivocally held that these plaintiffs did not have standing to pursue equitable or injunctive relief. That to me is significant because if you start following this out, and your honor, I believe this goes to where your question was asking about coaching. If you're arguing that you're being provided inadequate coaching or inadequate access to the training room or not preferential treatment to the training room, those are the kind of claims you would expect to see as injunctive or equitable claims to change your access because where's the compensable injury from that? Judge Godbee held that these plaintiffs do not have standing to sue for those kind of equitable or injunctive claims and the appellants have not appealed that. Instead, we have a summary judgment order that talks about the plaintiff, the plaintiff McGowan is the one that was allowed to proceed beyond summary judgment. SMU did not even move for summary judgment on limitations against McGowan because of the fact pattern. In the process of ruling, Judge Godbee said unequivocally and the issue was raised by all the appellants, you're limited to compensatory damages. You're not allowed in Title IX to get pain and suffering, emotional distress, psychological harms, you're limited to compensatory damages. When you put all of this together with what the plaintiffs pleaded and were allowed to sue which were the three issues, the only compensable injury or compensable damage relates to, everything relates to the physical hip injury. So Your Honor, that was a long answer but my point is, you're right, it's possible to be different but the problem is in this case, it's not different because they don't have and are not seeking to appeal the ability to seek injunctive relief or anything else that would allow them to get beyond the one compensable event which was the hip injury. Your Honor, briefly, the plaintiffs have pleaded several doctrines. They've tried to plead the fraudulent concealment doctrine for example. That's a high standard and again, how do you conceal information when you're sending people to the very source of where the information is at the Carroll Clinic? And so in the end, Your Honors, we believe that Judge Godbee got this exactly right and again I mentioned the Hilberg decision where Magistrate Judge Rutherford wrote an extensive opinion on this subject as well where she even more directly talks about the fundamental problem with the approach that the appellants are taking. This is the categorical approach from Texas. You are not dealing with any type of latent injury. As far as the case law goes, we're most like the Schlumberger case that the Texas Supreme Court addressed. The child's case is a latent injury case. And so as a matter of law, Judge Godbee got this decision exactly right. These appellants did not assert their claims soon enough. As far as the timing, they had access to the doctors. They knew that their other teammates were being injured. They were in touch with the Carroll Clinic. They were working with the physical therapists that work with the Carroll Clinic. They even had their surgeries. At some point, limitations clearly has been triggered and the appellants did not file suit within two years. As a result, their claims are barred. And Your Honors, unless there are any further questions, I will yield back the rest of my time. Thank you. Okay. Thank you. All right. We'll hear from Ms. Haddock. Ms. Haddock. The Rowers agree with SMU that it's important to look at the Eaton Report and what the Carroll Clinic said. We absolutely agree with that. In fact, we also agree that they were—continued to be on inquiry. In fact, it was Lindsey Heyman who was working with the physical therapist who—she's the one who told her about the Eaton Report during her treatment in the summer of 2017. She first learned about the Eaton Report. And we also agree that it should be read because Coach Wright rejected the Eaton Report. And it's in the record that although he appeared to be on board with it initially, once he read Dr. Eaton's findings and suggestions, he balked. And Mike Morton, who was director of sports medicine at the time, testified in his deposition and is reflected in emails and, in fact, in the written response to Tabitha Eaton that thank you, but no thank you, you're not a rower and you don't know what you're talking about. None of the recommendations that she made were followed. She also created a core strengthening program and met with assistant coach Jesse Hooper in order to implement those. And keep in mind the timing of this is important. It was in 2013 before five of these rowers even enrolled at SMU. The fall of 2013 was when five entered the program. And so prior to them even entering the program, they had been recommended to use this core strengthening program to avoid the deflection, to not encourage straight back that caused interior tilt. When she did the functional assessments, she even examined four of those. Two of them showed red flags already with clicking and popping in their hips and pain upon flexion. No one ever told the rowers that information. And that was at a time when their injuries could have been prevented. It was within the first month or two that they had even started rowing in the program. So in the fall, the next fall of 2014, well let me back up. The Carroll Clinic gives us some additional facts. In 2012, in January, one of the doctors met with Coach Wright at the request of his supervisor Monique Holland to try to find out what was going on. Why were there so many hip injuries specifically? And he said at that time that rowing can exacerbate an issue if a woman or any athlete has FAI, which is femoral acetabular impingement. The doctor told Coach Wright that the only way to really be sure is to implement a screening process. And Coach Wright reported that to Dr. Holland, that if we do x-rays, Dr. Worrell says that if we do x-rays and find out whether they have FAI, that would be the only way to prevent, we could prevent it. And it would be less expensive than having them get injured and then being disqualified. They never implemented any sort of screening program, and specifically not that one. Because what we find through discovery, by 2018, when the fall entering class is coming in under the new coach, one of the doctors from the Carroll Clinic sends an email and says if we're documenting pre-existing conditions, we need to look at this one, but it's up to Mike Morton, still don't know what you guys want to do about that. So six years after the Carroll Clinic physicians told the rowing program administrators that a screening process could have been implemented and anyone with FAI could have been either the training program could have been modified for them, because we know from our experts that FAI is not necessarily an uncommon condition, but having FAI does not preclude you from being a successful rower. It's how the training is implemented that makes the difference. And so for six years, they knew they could screen these women and they didn't. And every one of these rowers has FAI. So if they had been screened, or even if they had been warned when Tabitha Eaton did the functional assessments, this could have been avoided. And particularly about, I see my time is up. If you want to finish one sentence, go ahead. In particular, the timing of that Carroll Clinic advice about the FAI coincides exactly with Rebecca Tate, who is one of the rowers. At the very same time she was being injured and being told it's because she's new to rowing, is at this exact same month that it was suggested that the FAI could prevent the further rowing. Okay. Thank you both. We'll take this case under review.